RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOE D'AMBROSIO,

*Plaintiff-Appellant,*

*v.*

No. 13-3118

CARMEN MARINO, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland
No. 1:11-cv-00933—Dan A. Polster, District Judge.

Argued: January 23, 2014

Decided and Filed: March 27, 2014

Before: SUHRHEINRICH, GRIFFIN, and KETHLEDGE.

---

## COUNSEL

**ARGUED:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant. Alejandro V. Cortes, CITY OF CLEVELAND DEPARTMENT OF LAW, Cleveland, Ohio, for Appellee City of Cleveland. Stephen W. Funk, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellee Allen. Edmund W. Searby, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Cuyahoga County Appellees. **ON BRIEF:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant. Shawn M. Mallamad, CITY OF CLEVELAND DEPARTMENT OF LAW, Cleveland, Ohio, for Appellee City of Cleveland. Stephen W. Funk, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellee Allen. Edmund W. Searby, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Cuyahoga County Appellees.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.   Plaintiff Joe D'Ambrosio spent twenty years on Ohio's death row before he was granted unconditional habeas corpus relief on the grounds that the Cuyahoga County prosecutor violated his obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).   After his release, D'Ambrosio filed this civil rights action pursuant to 42 U.S.C. § 1983, claiming that defendants violated his constitutional rights.   The district court granted defendants' motions for judgment on the pleadings, concluding that D'Ambrosio's second amended complaint failed to plausibly allege any viable constitutional claims.   D'Ambrosio appeals.   We affirm.

I.

D'Ambrosio's complicated circumstances have been previously recounted by our court. In brief, D'Ambrosio was convicted in 1989 in Ohio state court of murdering Anthony Klann and was subsequently sentenced to death.   In 2008, a panel of this court affirmed the district court's grant of a conditional writ of habeas corpus based on the prosecution's failure to disclose material exculpatory evidence to D'Ambrosio, in violation of *Brady*.   *See D'Ambrosio v. Bagley (D'Ambrosio I)*, 527 F.3d 489, 493 (6th Cir. 2008).

The conditional writ required the state either to set aside D'Ambrosio's conviction and sentence or retry him.   *See D'Ambrosio v. Bagley (D'Ambrosio II)*, 656 F.3d 379, 381 & n.1 (6th Cir. 2011).   The state attempted to reprosecute D'Ambrosio through mid-2009, but it continued to fail to disclose exculpatory evidence and failed to alert D'Ambrosio or the state court that its key witness had died in the interim.   Ultimately, the district court granted an unconditional writ of habeas corpus, citing the "extraordinary circumstances" of the case and barring Ohio from reprosecuting D'Ambrosio.   *D'Ambrosio v. Bagley*, 688 F. Supp. 2d 709, 728 (N.D. Ohio 2010).

The state appealed the grant of the unconditional writ, arguing that the district court lacked subject-matter jurisdiction to enter the order granting the writ.   In August 2011, a split panel of this court affirmed, reasoning that the district court had retained subject-matter jurisdiction over the case because the state had not complied with the conditional writ:

D'Ambrosio had not been retried, and his state conviction had not been vacated before the grant of the unconditional writ. *See D'Ambrosio II*, 656 F.3d at 388. The state sought a writ of certiorari in the Supreme Court but was unsuccessful. *See Bobby v. D'Ambrosio*, 132 S. Ct. 1150 (2012) (denying certiorari).

Meanwhile, in May 2011, D'Ambrosio filed this 42 U.S.C. § 1983 civil rights action against several of the individuals and entities involved in his state prosecution. Count One of D'Ambrosio's second amended complaint (the "complaint") asserted a claim against Cuyahoga County prosecutors Carmen Marino and William Mason in their official capacities, and a *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), claim against Cuyahoga County. According to the complaint, Marino and Mason failed to disclose material exculpatory evidence to D'Ambrosio during his trial and also, by virtue of their roles as "final and official policymakers for the Prosecutor's Office," "created and maintained an official policy, practice, and/or custom" of violating criminal defendants' constitutional rights both with respect to D'Ambrosio specifically and to criminal prosecutions handled by the office in general.

Count Two of the complaint alleged a claim against Cleveland Police Detective Leo Allen—the lead detective who had investigated the case—in his individual and official capacities, and a *Monell* claim against the City of Cleveland. According to the complaint, Detective Allen violated D'Ambrosio's constitutional rights when he "failed to disclose exculpatory evidence to D'Ambrosio prior to, during, and after his trial."[1]

Each of the defendants moved for judgment on the pleadings, which the district court ultimately granted. Although the district court rejected defendants' assertion that D'Ambrosio's action was barred by the two-year statute of limitations, it ruled that the complaint failed to allege either that Detective Allen and the City of Cleveland violated D'Ambrosio's constitutional rights or that Cuyahoga County and the prosecutors caused him compensable constitutional injury. D'Ambrosio now appeals the district court's entry of judgment against his claims.

---

[1]The complaint also alleged two other counts against additional defendants, but D'Ambrosio has not appealed their dismissal.

II.

The same de novo standard of review is applicable to the district court's orders granting a motion for judgment on the pleadings and granting a Rule 12(b)(6) motion to dismiss. *See Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 713 (6th Cir. 2013). For a complaint to survive such motions, it must—when the record is construed in the light most favorable to the non-moving party and when all well-pled factual allegations are accepted as true—contain "either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013) (citation and internal quotation marks omitted). Still, this court "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010) (citation and quotation marks omitted). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 246–47 (6th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Rather, '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* at 247 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

III.

D'Ambrosio argues that his complaint sufficiently alleged three distinct claims: (1) a *Monell* claim against Cuyahoga County, based on the conduct of Marino; (2) a claim against Detective Allen for failing to disclose exculpatory evidence; and (3) a *Monell* claim against the City of Cleveland, based on Detective Allen's conduct. Although we agree with D'Ambrosio that his claims are not barred by the statute of limitations, he is nevertheless incorrect that his allegations are sufficient to state a claim for relief.

A.

As a threshold matter, each of the defendants contends that D'Ambrosio filed his complaint after the applicable limitations period had already concluded. The parties agree that

the applicable period is two years, *see Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007), but they disagree on when the cause of action accrued.

Defendants claim that, in cases like D'Ambrosio's, a § 1983 action accrues at the moment that a plaintiff's conviction or sentence has been "called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). According to defendants, D'Ambrosio's state conviction was "called into question" when the district court granted the conditional writ of habeas corpus in 2006, making D'Ambrosio's 2011 lawsuit more than three years late. D'Ambrosio, by contrast, argues that the statute of limitations does not begin to run until after the state court criminal proceedings against the plaintiff have "terminated" in the plaintiff's favor—which, in D'Ambrosio's view, does not occur as long as the state retains the ability to retry the plaintiff. *See DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996) ("Although in some instances a habeas court may terminate a criminal proceeding in the defendant's favor, the reversal of a conviction and remand for a new trial does not constitute such a termination.").

Both of these positions are incorrect. The "standard rule" is that a cause of action accrues "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (internal quotation marks, citations, and alterations omitted). Because an action generally accrues "when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred," we typically determine the accrual of a § 1983 action by "look[ing] to the event that should have alerted the typical lay person to protect his or her rights." *Cooey*, 479 F.3d at 416 (citations omitted). Here, application of the general rule would indicate that D'Ambrosio's cause of action accrued—and the limitations period began—when D'Ambrosio discovered that the exculpatory evidence in question had not been disclosed to him.

*Heck*, however, recognized that permitting a § 1983 action to proceed where success in the action would necessarily imply the invalidity of a criminal conviction might result in conflicting parallel litigation "arising out of the same . . . transaction" and would essentially permit a "collateral attack on the conviction through the vehicle of a civil suit." *Heck*, 512 U.S. at 484 (citations omitted). As a result, *Heck* modified the general rule of accrual for § 1983

actions by "delay[ing] what would otherwise be the accrual date of a tort action until the setting aside of an *extant conviction* which success in that tort action would impugn." *Wallace*, 549 U.S. at 393. Under *Heck*, "a cause of action under § 1983 that would imply the invalidity of a conviction does not accrue until the conviction is reversed or expunged, and therefore the statute of limitations does not begin to run until such an event occurs, if ever." *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005) (citation, internal quotation marks, and alteration omitted). "What might happen in a subsequent prosecution is neither here nor there; the claim accrues as soon as the only obstacle to the litigation—the adverse judgment—has been lifted." *Del Real v. Gomez*, 330 F. App'x 110, 111 (7th Cir. 2009) (unpublished order).

D'Ambrosio's argument that *Heck* tolls the accrual of his claims until the state cannot possibly retry him runs flatly counter to the Supreme Court's decision in *Wallace*, which rejected the argument that "an action which would impugn *an anticipated future conviction* cannot be brought until that conviction occurs and is set aside." 549 U.S. at 393. *Wallace* rebuffed concerns that filing a § 1983 action prior to trial might result in an adjudication that would conflict with a subsequent conviction, noting that district courts may "stay the civil action until the criminal case or the likelihood of a criminal case is ended." *Wallace*, 549 U.S. at 394. And the fact that the amount of damages recoverable by a § 1983 plaintiff may vary widely depending on whether he is convicted at a later trial did not sway *Wallace*, either: "The cause of action accrues even though the full extent of the injury is not then known or predictable." *Id.* at 391 (citation omitted).

We see no reason not to apply *Wallace*'s pretrial principles to the retrial context, as D'Ambrosio's position requires the same "speculat[ion] about whether a prosecution will be brought, whether it will result in conviction, and whether the pending civil action will impugn that verdict" that was fatal to the petitioner's position in *Wallace*. *Id.* at 393. Contrary to D'Ambrosio's argument, the possibility that his § 1983 claims "might impugn an anticipated future conviction d[oes] not trigger the *Heck* rule for deferred accrual." *Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007); *see also Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 639–41 (6th Cir. 2007).

By a similar token, though, defendants improperly ignore the requirement that § 1983 claims like D'Ambrosio's, which imply the invalidity of a prior conviction, accrue only when the conviction "is reversed or expunged." *Wolfe*, 412 F.3d at 714; *see also Wallace*, 549 U.S. at 393 (noting that, under *Heck*, a § 1983 action accrues only after a conviction is "set[ ] aside"). In support of their argument that D'Ambrosio's cause of action accrued the moment that the district court granted the conditional writ of habeas corpus, defendants cite *Smith v. Gonzalez*, 222 F.3d 1220 (10th Cir. 2000). But *Smith* does not support defendants' position. There, the Tenth Circuit held that the statute of limitations began when the plaintiff's state conviction was "vacated" in a § 2254 proceeding, at which point the success of a § 1983 action would not call the plaintiff's prior conviction into question. *Id.* at 1222. *Smith* is therefore perfectly consistent with the requirement that a § 1983 plaintiff's underlying conviction must be reversed or vacated before civil rights claims implicating the conviction accrue. *See Wallace*, 549 U.S. at 393; *Wolfe*, 412 F.3d at 714. *See also Poventud v. City of New York*, __ F.3d __, 2014 WL 182313, at *10 (2d Cir. Jan. 16, 2014) (noting that *Heck* does not bar a § 1983 suit "where the underlying conviction has already been expunged," even if the defendant is subject to retrial).

Application of this rule to D'Ambrosio's case is straightforward. Until the vacatur of D'Ambrosio's state conviction became final, *Heck* barred his § 1983 claims, which clearly implied the invalidity of his conviction. *See Wallace*, 549 U.S. at 393; *Wolfe*, 412 F.3d at 714. Crucially, a panel of this court held that D'Ambrosio's state conviction had not been vacated before the grant of the unconditional writ, which occurred—at earliest—in 2010. *See D'Ambrosio II*, 656 F.3d at 388. His § 1983 suit was filed in 2011. Because D'Ambrosio's civil rights claims did not accrue until his state conviction was vacated and the *Heck* bar was lifted, the two-year statute of limitations does not bar his current claims.

B.

Acknowledging that the individual prosecutors involved in his case "have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial," D'Ambrosio first contends that the district court erred in dismissing his *Monell* claim against Cuyahoga County, which employed them. *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010). "[U]nder § 1983, local governments are responsible only for their own illegal acts. They

are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (internal citation and quotation marks omitted). Instead, a municipality is liable under § 1983 only if the challenged conduct occurs pursuant to a municipality's "official policy," such that the municipality's promulgation or adoption of the policy can be said to have "cause[d]" one of its employees to violate the plaintiff's constitutional rights. *Monell*, 436 U.S. at 692.

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359. To properly allege a municipal liability claim, a plaintiff must adequately allege "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

D'Ambrosio first asserts that prosecutor Marino was a "policymaking official" of Cuyahoga County, such that the county may be liable for the decisions that Marino made with respect to D'Ambrosio's prosecution. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."); *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013). But this court has previously held that Ohio prosecutors act as arms of the state—not of a municipality—when prosecuting state criminal charges, meaning that their "actions in prosecuting the charge . . . [may] not be attributed to the [municipality]." *Pusey v. City of Youngstown*, 11 F.3d 652, 659 (6th Cir. 1993). *See also Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009) ("[C]ity prosecutors are considered state officials under Ohio law when they are responsible for prosecuting state criminal charges." (citation and internal quotation marks omitted)). Because he was acting as an agent of the state when prosecuting D'Ambrosio, Marino's conduct cannot have established a county policy, unconstitutional or otherwise. *See Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (conduct of municipal employee while he was deputized to work as a federal agent cannot have implicated a municipal policy).

D'Ambrosio nevertheless contends that his complaint identified an unconstitutional county policy. Explicitly conceding that he is not pursuing an argument that the county failed to properly train its prosecutors about their *Brady* obligations, D'Ambrosio instead argues that his complaint adequately alleged that county prosecutors habitually ignored criminal defendants' constitutional rights in a manner that was "so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359. In this respect, he appears to be arguing not that the prosecutors themselves established a policy of treating criminal defendants unconstitutionally, but that they were simply acting in accordance with a preexisting and ubiquitous county practice that can fairly be deemed to have originated with or at some point been adopted by the municipality. *See Burgess*, 735 F.3d at 478.

But this argument is belied by the allegations of the complaint. The complaint focuses on Marino's rather storied history of improper conduct, alleging that "Marino had a policy of not allowing defense attorneys to copy relevant documents regarding the case," that "Marino and Mason . . . created and maintained an official policy" to prosecute D'Ambrosio "without concern for his constitutional rights," that "Marino and Mason . . . created and maintained an official policy . . . of failing to adequately train" their fellow prosecutors about their *Brady* obligations, and that Marino has a "shameful track record of breaking rules to win convictions." Other than that, the complaint alleges only that "[t]he general practice of withholding exculpatory evidence . . . was so common and well settled as to constitute an official policy" of the Prosecutor's Office. In support of this assertion, the complaint alleges that one other prosecutor believed that the entire Prosecutor's Office possessed a view of *Brady* obligations that was as "similarly limited" as Marino's. The complaint also alleges that this prosecutor handled D'Ambrosio's case in the same manner that he has handled all of the other cases that he has prosecuted.

These allegations are insufficient to plausibly allege the existence of an official county policy of violating criminal defendants' constitutional rights. The thrust of the complaint is that Marino—and perhaps one or two other members of the Prosecutor's Office—instigated and implemented habitually unconstitutional practices, not that they were following municipal policy in doing so. Municipal liability attaches only where the policy or practice in question is "attributable to the municipality," *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir.

2012), but D'Ambrosio's complaint contains no allegations that the practice at issue here was acquiesced to or informed by municipal actors rather than by prosecutors who had adopted the strategy in order to win criminal convictions. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives."); *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1120 (6th Cir. 1994) (municipality is liable under § 1983 only for "a pervasive custom or practice, of which the city lawmakers know or should know"). Again, state prosecutors' actions in prosecuting state crimes cannot themselves establish municipal policy. *Pusey*, 11 F.3d at 659; *see also Burley*, 729 F.3d at 619 (municipal employee's conduct while serving as a federal agent cannot be caused by municipal policy).

Even if D'Ambrosio's claim was construed as asserting a municipal custom of "inaction" in the face of prosecutors' habitually unconstitutional conduct, D'Ambrosio would have to allege (1) "a clear and persistent" pattern of unconstitutional conduct by municipal employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996) (citation omitted).

D'Ambrosio's complaint fails to allege such a claim in multiple respects. Instead of alleging a "clear and persistent" office-wide pattern of unconstitutional conduct, *id.*, D'Ambrosio's complaint is limited to allegations regarding the repeated failures of only one prosecutor: Marino. This pleading deficiency is not redeemed by the lone, conclusory allegation that one prosecutor believed that the other prosecutors in the office were similarly dismissive of defendants' constitutional rights. *See Twombly*, 550 U.S. at 555 (conclusory allegations are insufficient to survive a motion to dismiss).

Nor does the complaint plausibly allege the county's "notice or constructive notice" of habitually unconstitutional conduct. *Doe*, 103 F.3d at 508. The Supreme Court has stated in the

context of a failure-to-train claim that a municipality cannot have acted with the required "deliberate ignorance" to the need for a policy change absent its awareness of a prior "pattern of similar constitutional violations." *Connick*, 131 S. Ct. at 1360. For the *Connick* Court, four prior *Brady* violations over the course of a decade were not enough to place the prosecutor's office on notice that any sort of action was necessary in order to avoid the *Brady* violations at issue in *Connick*. *Id.* Here, D'Ambrosio claims that the county had sufficient notice of an office-wide practice of persistent unconstitutional conduct by virtue of only one other *Brady* violation and nine other non-*Brady* instances of prosecutorial misconduct—all of which were committed by Marino over two decades. Of these ten cited examples of misconduct, only three had been ruled as improper by the courts prior to D'Ambrosio's conviction in 1989. *See Lott v. Coyle*, 366 F.3d 431, 433 n.1 (6th Cir. 2004) (cataloguing instances of Marino's misconduct). All three of these cases involved Marino's improper trial comments; they did not involve *Brady* violations. *Id.*

In *Connick*, four previous *Brady* violations were insufficient to alert the prosecutor's office that another *Brady* violation might occur in the future in the absence of corrective action. Here, the county's knowledge of only three prior instances in which only one of its prosecutors had made improper comments at trial was less. *Connick*, 131 S. Ct. at 1360 (noting that only "similar" incidents of prior misconduct can put a municipal actor on notice that comparable misconduct may occur in the future). This is true even if the county had been aware of Marino's lone other *Brady* violation before a court had identified it as such. Until the county had notice of persistent misconduct, it did not have "the opportunity to conform to constitutional dictates," nor could its inaction have caused the deprivation of D'Ambrosio's constitutional rights. *Id.* at 1360 n.7 (citation omitted). The county cannot have tacitly approved an unconstitutional policy of which it was unaware. *See Doe*, 103 F.3d at 508.

As we recognized in D'Ambrosio's previous two appeals to this court, there is no question that the individual prosecutors involved in D'Ambrosio's case violated rights secured to him by the Constitution. But D'Ambrosio's complaint amounts to an attempt to hold the county liable for what Marino and his colleagues did wrong. And this is insufficient to state a claim under *Monell*. A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, "*solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691.

Instead, a municipality is liable under § 1983 only where, "through its deliberate conduct," it was "the 'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (citation omitted).    By focusing almost exclusively on the conduct of Marino, D'Ambrosio's complaint is improperly attempting to impose liability upon the county "simply because the municipality hired one 'bad apple.'" *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985).  Because *Monell* precludes this theory of liability, we agree with the county that the district court correctly granted judgment on the pleadings in its favor.

C.

Next, D'Ambrosio argues that the district court erred by dismissing his claim that Detective Allen, who was the lead investigator in D'Ambrosio's criminal prosecution, violated *Brady* in failing to disclose material exculpatory evidence to the defense.

Generally speaking, D'Ambrosio is correct that *Brady* requires the disclosure to the defense even of "evidence known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (internal quotation marks and citation omitted). But while a police officer's concealment of material exculpatory information may ultimately result in a *Brady* violation, the role that a police officer plays in carrying out the prosecution's *Brady* obligations is distinct from that of a prosecutor.  "Police officers do not disclose evidence to criminal defendants directly." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) (citation omitted).  Instead, police officers fulfill their *Brady* obligations as long as they "inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime." *Id.* at 378.   The prosecutor, by contrast, is the member of the prosecution team that bears the responsibility for actually disclosing exculpatory information to the defense. *Id.* at 381.  The fact that *Brady* may require disclosure of evidence known only to the police and not to the prosecutor means only that it "imposes upon prosecutors a duty to learn of any favorable evidence known to the others acting on the government's behalf[,] including the police." *Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (internal quotation marks omitted).  It does not mean that a police officer must disclose any sort of information—even information known only to the officer— directly to the defense.

Because *Brady* obliges a police officer to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense, "prosecutors and police officers are capable of breaching [the prosecution team's *Brady* obligations] in factually different ways." *Moldowan*, 578 F.3d at 380 (citation omitted). And here, that distinction matters. D'Ambrosio's allegations that Detective Allen "was privy to" exculpatory evidence but withheld it "from the defense" and failed to disclose it "to D'Ambrosio" are beside the point. Detective Allen was never required to do otherwise.

D'Ambrosio is correct that Detective Allen bore a "'*Brady*-derived' responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Id.* at 381 (quoting *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008)). But this disclosure obligation is limited: *Brady* requires a police officer to disclose evidence to the prosecutor only when its exculpatory value is "apparent" to the officer, *id.* at 384, 388; that is, when the officer is aware that the evidence "could form a basis for exonerating the defendant." *Id.* at 388 n.14 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Because an officer's "destruction or concealment" of obviously exculpatory evidence "can never be done in good faith and in accord with [the officer's] normal practice," *id.* at 389 (internal quotation marks omitted), this rule is "the functional equivalent" of a requirement that the officer act in bad faith. *Id.* at 407 (Kethledge, J., concurring in part and dissenting in part). *See also Elkins v. Summit Cnty.*, 615 F.3d 671, 677 (6th Cir. 2010) (noting that the relevant test is "whether the exculpatory value of the [evidence] would have been apparent to the detectives given the state of the case at the time").

Although D'Ambrosio argues that his complaint sufficiently alleges that Detective Allen failed to disclose *to the prosecution* evidence of an obviously exculpatory nature, that is not what his complaint says. Instead, the complaint alleges only that Detective Allen "was privy to" several pieces of evidence, including some that clearly were incompatible with the prosecution's theory of the case.[2] The complaint does not allege that Detective Allen withheld any of this

---

[2] For example, police had received a tip that another individual, Paul Lewis, had a motive to kill Klann because Klann was a witness in a rape case that was pending against Lewis. (Marino was also the prosecutor in Lewis's rape case, which was dismissed after Klann was killed.) Lewis had also asked the police whether Klann's hands had been cut, which was not publicly-known information. Officers also possessed information that the testimony of Eddie Espinoza, the prosecution's star witness, was not believable. Espinoza had indicated that D'Ambrosio stabbed Klann several times in a creek where Klann's body was later found, but no blood was present at the creek, bloody clothes were found at a separate location, Klann was wearing neither shoes nor underwear, and an individual who lived in Lewis's apartment complex had heard someone say, "Let's dump the body." Further,

information from the prosecutor, that the prosecutor was ignorant of any of this evidence, or anything other than that Detective Allen failed to disclose this evidence to D'Ambrosio himself. Again, for D'Ambrosio's complaint to state a claim against Detective Allen, he must plausibly allege that Detective Allen failed to carry out his "*Brady*-derived responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Moldowan*, 578 F.3d at 381 (internal quotation marks omitted). Yet the complaint fails to do so: there is no allegation that Detective Allen knew about any obviously exculpatory evidence of which the prosecutors were ignorant and failed to apprise them of it. Instead, the complaint faults Detective Allen for being "privy to" exculpatory information that he did not pass along to D'Ambrosio. But disclosing this information to the defense was, as *Moldowan* made clear, the responsibility of the prosecutors, not Detective Allen. *Id.* at 378–79. As a result, the complaint fails to plausibly allege that the suppression of any of the obviously exculpatory evidence in this case was caused by Detective Allen's abdication of his constitutionally required duties.

The complaint contains only one explicit allegation that Detective Allen knew something that the prosecutors did not: an isolated assertion that, "based on differences between the police file and prosecutor's file, . . . Allen even withheld documents from the prosecutor's office that could be revealed to the defense." But there is no allegation regarding the nature of these documents or what information they contained, and there is nothing in the complaint that identifies the documents as containing any "apparent[ly]" exculpatory information. Although the complaint specifies several obviously exculpatory pieces of evidence that Detective Allen "was privy to," there is no allegation that any of this information was contained in the documents that Detective Allen withheld from the prosecutor's office.

### D.

This defect in D'Ambrosio's complaint is also fatal to his claim against the City of Cleveland. After all, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the [municipality] might have authorized [unconstitutional conduct] is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

---

although Espinoza claimed that Klann was killed on Friday night after a disturbance at a local bar involving D'Ambrosio, police reports and bar management indicated that the disturbance had occurred on Thursday night, as D'Ambrosio had claimed.

Because D'Ambrosio's complaint fails to allege a claim against Detective Allen, his claim against Cleveland must also fail.

IV.

For these reasons, we affirm the judgment of the district court.